IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ASTRA OIL TRADING NV,<br>ASTRA GP, INC., and<br>ASTRA TRADECO LP LLC, | §<br>§<br>§<br>§ | |
| Plaintiffs, | §<br>§ | |
| v. | §<br>§ | CIVIL ACTION NO. H-09-1274 |
| PETROBRAS AMERICA INC.,<br>PAI PRSI TRADING GENERAL LLC,<br>and PAI PRSI TRADING LIMITED<br>LLC, | §<br>§<br>§<br>§<br>§ | |
| Defendants. | §<br>§ | |

## MEMORANDUM AND ORDER

Pending are Petitioners Astra Oil Trading NV, Astra GP, Inc., and Astra Tradeco LP LLC's Amended Motion for Order and Judgment Confirming Arbitration Award (Document No. 53) and Respondents Petrobras America Inc., PAI PRSI Trading General LLC, and PAI PRSI Trading Limited LLC's Motion to Dismiss (Document No. 19) and Motion for Partial Vacatur and Modification of Arbitration Award (Document No. 38). After carefully considering the motions, responses, the arbitration award, the applicable law, and the oral arguments of counsel, the Court concludes for the reasons that follow that the Final Award of Arbitrators should be confirmed.

I.  <u>Background</u>

Petitioners Astra Oil Trading NV ("AOT"), Astra GP, Inc. ("Astra GP"), and Astra Tradeco LP LLC ("Astra LP," collectively with AOT and Astra GP, "Petitioners") seek in this action judicial confirmation of an arbitral award rendered in their favor against Respondents Petrobras America, Inc. ("PAI"), PAI PRSI Trading General LLC ("PAI General"), and PAI PRSI Trading Limited LLC ("PAI Limited," collectively with PAI and PAI General, "Respondents"). Petitioners and Respondents were 50% co-owners of a joint venture consisting of two companies.  The first company--Pasadena Refining System, Inc. ("PRSI")--owns a refinery in Pasadena, Texas.  PRSI was governed by a Shareholders Agreement between AOT and PAI.[1]  The second company--PRSI Trading Company LP (the "Trading Company")--is an entity that supplies feedstocks to the refinery.  The Trading Company was governed by a Partnership Agreement between Astra GP, Astra LP, PAI General, and PAI Limited.[2]  If certain triggering events occurred, both the Shareholders Agreement and the Partnership Agreement gave to Petitioners the right "to put" for sale to Respondents their ownership interests in PRSI and the Trading Company, in exchange for Respondents' payments to Petitioners of sales prices set by pricing formulas.

---

[1] Document No. 38, ex. A-2.

[2] Id., ex. A-3.

2

Soon after the execution of the Agreements, the parties began having disputes about the strategic vision of the PRSI refinery and the Trading Company.  When Respondents unilaterally adopted certain resolutions for the PRSI refinery and the Trading Company, Petitioners asserted that Respondents had exercised their contractual "override" rights, thus triggering Petitioners' contractual rights to put their 50% ownership interests in the PRSI refinery and the Trading Company to Respondents.  Respondents refused to recognize Petitioners' attempt to exercise their put rights, and the disagreement culminated in the arbitration underlying this confirmation proceeding.  Among other defenses, Respondents claimed that Petitioners had breached certain provisions of the Agreements and also claimed that Petitioners breached fiduciary duties owed to the Trading Company.

On April 10, 2009, the arbitration panel (the "Panel") in a 70-page ruling issued its Final Award of Arbitrators (the "Award"), which determined every request for relief and claim by both parties.[3]  The Panel denied all of Respondents' claims against Petitioners.  The Award required Petitioners no later than April 27, 2009, to transfer their ownership rights in PRSI and in the Trading Company to Respondents and, in exchange, Respondents were

---

[3] Document No. 53, ex. A-1 (hereinafter cited as the "Award"). The Award incorporated interim rulings made by the Panel.

3

required to make several payments to Petitioners, totaling in all $639,166,258.90, to be paid as follows:

(a)   PAI must pay to AOT the sum of $295,629,834, plus $8,301,293 in pre-Award interest, by April 27, 2009, for AOT's interest in the PRSI refinery;[4]

(b)   PAI General and PAI Limited must pay to Astra GP and Astra LP $85,367,385 on September 17, 2009, and $85,367,384 on September 17, 2010, for their interests in the Trading Company.[5]   PAI is required to guarantee these payments;[6]

(c)   PAI General and PAI Limited must pay to AOT an additional $156,442,878.93, plus $3,364,593 in pre-Award interest, by April 27, 2009, as reimbursement to AOT for a payment it made to the Trading Company's financing bank pursuant to a guarantee of the Trading Company's debts given by AOT;[7]

(d)   Respondents shall pay to Petitioners, by April 27, 2009, the sum of $3,927,140 to reimburse Petitioners for their legal fees incurred in connection with the arbitration, an additional $732,501 to reimburse Petitioners for their related legal expenses,[8] and $33,249.97 to reimburse Petitioners for amounts they overpaid to the International Centre for Dispute Resolution.[9]   Respondents are jointly and severally liable to Petitioners for these amounts;[10] and

---

[4] Award at 55-56 and 61-62.

[5] Award at 56-57.

[6] Award at 57.

[7] Award at 62 and 68.

[8] Award at 66.

[9] Award at 69.

[10] Award at 66 and 69.

(e) All amounts not paid when due under the Award shall accrue post-Award interest at a rate of 5% compounded annually from and after the date the amounts were due.[11]

Petitioners timely transferred their ownership interests to Respondents on April 27, 2009, but Respondents refused to abide by the Award and make their requisite payments. Petitioners filed this suit to confirm the Award, and Respondents have moved to dismiss it for lack of subject matter jurisdiction and, as well, move to vacate and/or modify the Award.

## II. Discussion

### A. Respondents' Motion to Dismiss

Respondents assert that AOT is a citizen of the United States, and that the Court therefore lacks subject matter jurisdiction. For jurisdiction, Petitioners rely on the U.N. Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958 (the "U.N. Convention"), implemented at 9 U.S.C. §§ 201-08. Title 9, United States Code, Section 203, deems actions involving awards under the U.N. Convention as arising under the laws and treaties of the United States, and vests original jurisdiction in federal district courts to hear such actions. 9 U.S.C. § 203. The Convention applies only to arbitral awards that are "not considered

_____

[11] Award at 67 and 70.

5

as domestic awards in the State where their . . . enforcement is sought."   U.N. Convention, art. I(1), 21 U.S.T. 2517, 330 U.N.T.S. 38.   Section 202 delineates whether an award falls under the Convention:

> An agreement or award arising out of [a commercial] relationship which is entirely between citizens of the United States shall be deemed not to fall under the Convention unless that relationship involves property located abroad, envisages performance or enforcement abroad, or has some other reasonable relation with one or more foreign states.  For the purpose of this section a corporation is a citizen of the United States if it is incorporated or has its principal place of business in the United States.

9 U.S.C. § 202.

Petitioners contend that the Award is not "entirely between U.S. citizens" because AOT is a corporation organized under the laws of the Netherlands and its principal place of business is not in the United States.   It is uncontroverted that AOT is a Netherlands corporation, but Respondents argue that its principal place of business is in the United States solely due to the presence and activities in Huntington Beach, California, of one individual, Mike Winget, who bears the title of Chairman and CEO of AOT.  Petitioners, who are the parties invoking the Court's subject matter jurisdiction, have the burden to show that AOT's principal place of business is not in the United States.  *See* 13F CHARLES ALAN WRIGHT, ET AL., FEDERAL PRACTICE AND PROCEDURE § 3625 (3d. ed. 2009) (stating that party attempting to establish diversity jurisdiction

is not required specifically to prove state of its principal place of business, but only that its principal place of business is diverse from other party).

The language Congress used in its 1970 enactment of § 202 to define whether a corporation is a citizen of the United States essentially tracks identical language found in the 1958 re-codification of the diversity of citizenship statute, 28 U.S.C. § 1332(c)(1). Thus, under § 1332(c)(1), a corporation is a citizen of the State of its incorporation and where "it has its principal place of business." Under § 202, a corporation is a citizen of the United States if it was incorporated in the United States or if "it has its principal place of business" in the United States. The Supreme Court last month interpreted the meaning of a corporation's "principal place of business" in a diversity case, and that decision guides the Court in applying § 202's identical language in this case. *See* <u>Hertz Corp. v. Friend</u>, --- S.Ct. ----, 2010 WL 605601, at *11 (Feb. 23, 2010).

In <u>Hertz</u>, the Supreme Court resolved a conflict among the circuits by rejecting the Ninth Circuit's place of activities test, under which the district court had found Hertz Corporation's principal place of business to be in California because its business activities there were significantly greater than its business in any other state. Instead, a unanimous Supreme Court adopted what some circuits have called the "nerve center"

7

principle, that is, a test that "points courts in a single direction, towards the center of [the corporation's] overall direction, control, and coordination." Id. at 17.  This is the place "where a corporation's officers direct, control, and coordinate the corporation's activities," and "normally [is] the place where the corporation maintains its headquarters--provided that the headquarters is the actual center of direction, control, and coordination, i.e., the 'nerve center' and not simply an office where the corporation holds its board meetings." Id. at 14.

The parties in this case conducted limited discovery to develop the facts bearing upon whether AOT is a citizen of the United States, and specifically whether "it has its principal place of business" in the United States.  The Court now must make that determination from a preponderance of the evidence, and in the light of Hertz.

To begin with, it is uncontroverted that AOT is only a holding company, formed under the laws of the Netherlands which, beginning in November 2008, has been wholly owned by a newly formed Swiss corporation, TAGAM, Ltd., which in turn is wholly owned by Transcor Astra Group ("Transcor"), a Belgium corporation.  Transcor has its sole office in Belgium.  Before November 2008, Transcor owned 100% of AOT, and AOT's counsel represents that Transcor formed TAGAM as a subsidiary to hold AOT only for tax purposes.  There is no

evidence that TAGAM has any active role directing, controlling, or coordinating AOT's business.

As a holding company, AOT does not manufacture, sell, trade in, or provide any products or services. It has no employees or office in the United States, not even a bank account. Winget himself, who as mentioned above bears the title of CEO of AOT, is actually employed and paid by an AOT subsidiary, which is located in Huntington Beach, California, and it is there that Winget offices. AOT's sole business activity is to acquire, hold, and sell interests in other companies, and activities incidental to holding those interests. AOT's holdings include subsidiaries located in Singapore, Switzerland, the United Kingdom, Canada, and the United States. In 2008, the total sales revenues of the operating companies held by AOT exceeded $16.7 billion, most of which ($8.5 billion) was attributed to sales from non-U.S. operating companies in Singapore, Switzerland, and Canada.

Among AOT's worldwide holdings are subsidiaries that operate in four states of the United States, which subsidiaries engage in the business of trading crude oil and refined oil products, coal, coke, and natural gas. It also owns a subsidiary that operates a refinery in the State of Washington. All of those subsidiaries are separate legal entities with their own officers, directors, employees, bank accounts, financial, accounting, and tax records.

Where then is the "center of overall direction, control, and coordination" for AOT, whose holdings are worldwide and far flung? As observed above, AOT has no employees, bank accounts, offices, or the like in the United States.  Organized as a Netherlands corporation, its formal corporate structure consists of a Board of four directors:  Rolf Mueller of Zug, Switzerland; Ernst Cooiman of Rotterdam, Netherlands; Daniel Burla of Zug, Switzerland; and Mike Winget of Huntington Beach, California.  The Board has no formal meetings and acts by signing unanimous consents, which is a common practice for wholly owned subsidiaries that have little operational activity and are directed and controlled by their 100% owner. Three of the four directors (Mueller, Burla, and Winget) are also directors on the nine-member Board of Directors of AOT's upstream parent corporation, Transcor, the Belgium company.  Six of the nine Transcor board members reside in Europe, including most importantly Gilles Samyn, who is Chairman of the Board of Transcor and who is also the Chief Executive Officer of Compagnie Nationale á Portefeuille ("CNP"), a Belgian publicly-traded corporation that does no business in the United States, and which indirectly owns 80% of the stock of Transcor.  Chairman Gilles Samyn presides over Transcor's formal board meetings, which are held at least twice a year and almost always in Europe.

The evidence establishes that all substantial and consequential business decisions with respect to the business of

AOT are made by the officers and directors of Transcor. For example, it is Transcor that determines whether AOT should buy a company and, while Winget might be involved in executing the decision by negotiating the deal or signing the contract, it is not he who sets the policy or makes the decision. That person is Gilles Samyn. Winget acknowledged in his deposition testimony that Samyn "calls the shots" and that Winget speaks with Samyn weekly. Winget testified that he himself had "virtually no authority to acquire any asset, anywhere, whether it's a dollar or otherwise, without Mr. Samyn being involved with it." For example, if a trader came in and proposed to Winget to purchase a tank farm in Malta, "there is no way I would make that kind of decision, cannot, not allowed to." Thus, as a holding company, the controlling decisions of consequence on what AOT will purchase, hold, sell, and the like, are decisions not made by Winget but are directed by Gilles Samyn and the Transcor board that he chairs, who form the "nerve center" that actually controls AOT, gives to it its overall direction, and coordinates its activities.

Given AOT's European "nerve center" from which it is controlled, directed, and coordinated, it follows--as the uncontroverted evidence establishes--that AOT's essential support activities are not located in the United States. Thus, AOT's finances are managed in Switzerland by Rolf Mueller. AOT's accountants are located in Zurich, Switzerland, and it is there

that Mr. Mueller deals with auditors on behalf of AOT. AOT's secretary, Mr. Cooiman who resides in Rotterdam, is responsible for maintaining the records of AOT board actions taken by written consents, filing AOT's Dutch income tax returns and statutory reports, handling the AOT bank account, expenses and fees, and maintaining the original records of payment vouchers and bank statements. Winget, on the other hand, in Huntington Beach, California, believes that he has not ever signed a check on behalf of AOT and does not believe he even has the authority to do so.

Respondents argue, however, that "Petitioners cannot rely on the activities and decision-making of [Transcor] to establish AOT's principal place of business." Respondents rely on the general rule that "the alter ego doctrine may not be used to create diversity jurisdiction by ignoring the principal place of business of a subsidiary corporation and imputing to it the principal place of business of the parent." J.A. Olson Co. v. City of Winona, Miss., 818 F.2d 401, 414 (5th Cir. 1987). Olson, however, which applied the now abrogated "total activity" test, see Hertz, did not reject the principle that a weighing of the evidence must be made to determine *where in fact is* the subsidiary's actual place of business. In other words, Olson only held that a subsidiary cannot claim its parent's principal place of business by invoking the alter ego doctrine while ignoring the facts bearing upon where the subsidiary's *actual* principal place of business is located. Thus,

12

in its analysis Olson recognized and discussed an important Fifth
Circuit precedent, Toms v. Country Quality Meats Inc., 610 F.2d
313, 315 (5th Cir. 1980), where the subsidiary's principal place of
business was found to exist in its "nerve center," which was in
fact where its parent operated and directed the subsidiary's
activities and business.   Olson summarized the Fifth Circuit's
decision in Toms as follows:

> Country Quality, a Delaware corporation qualified to do
> business in Georgia, was one of sixty similar
> corporations created and managed by Brueggemeyer & Wolfe
> (B & W), a Texas corporation.  Country Quality, like the
> other local corporations, was run by B & W, but paid
> local taxes, had a local bank account, and had its own
> staff.  B & W, however, exercised almost total control
> over Country Quality in that it was authorized to
> discharge employees, it reviewed all sales reports, time
> cards and payroll sheets and it selected the suppliers
> from which Country Quality could buy its products.  We
> also noted that Country Quality was vested with so little
> managerial authority that its highest-ranking employee
> "wore an apron," that is, "was primarily engaged in meat
> cutting activities." Even though Country Quality had its
> only contact with the public in Georgia, we looked at the
> operation as a whole.  The scenario was similar to that
> of a "far flung" corporation with a concentrated nerve
> center and diffuse places of activity.  Country Quality's
> operations represented only a single location of the many
> locations of the corporate activities; the nerve center,
> however, was in one location.  We therefore held that the
> principal place of business was Texas, the "nerve center"
> of the operation.

Olson, 818 F.2d at 410-11 (internal citations and footnotes
omitted).  The Fifth Circuit further explained:

> As demonstrated in Toms, a corporation's nerve center
> does not have to be located within the corporate shell,

13

but can be found wherever the nerve center exists.  In
<u>Toms</u>, the activities and business of Country Quality were
operated and directed by a closely affiliated but
corporately separate management company.  We therefore
consider substance over form in determining the nerve
center.

<u>Id.</u> at 412.

The facts of this case fall squarely within these holdings.
It is Transcor's Board and its Chairman Gilles Samyn who form the
"nerve center," and "call the shots," for the "overall direction,
control, and coordination" of AOT, which Transcor uses as a holding
company.  Although director Winget is titled as "CEO" of AOT, and
evidently makes a necessary contribution in negotiating, preparing,
and signing contracts in its name, he does so only to execute
business activities specifically authorized, approved, and directed
from abroad by the Transcor/AOT boards and Gilles Samyn.  His self-
described role in the Huntington Beach office is "to be the conduit
to the will of the Transcor Astra pushed down through AOT
directives."  Winget would not even reorganize the structure of
AOT's subsidiaries--which were behaving like "independent silos"--
without first discussing his administrative proposal with the
Transcor board.  Only then did he form a "trade management
committee" comprised of the heads of AOT's various trading
subsidiaries to foster cooperation among them.

Hertz teaches that the Court must locate the "center of [the
corporation's] overall direction, control, and coordination."  On

14

this record the Court finds from a preponderance of the evidence
that AOT, a Netherlands chartered corporation with sizeable world-
wide holdings, does not receive its "overall direction, control,
and coordination" from Winget in Huntington Beach, California.  To
the contrary, the "nerve center" for AOT's business is lodged in
AOT's 100% owner, Transcor, and its Chairman Gilles Samyn, based in
Europe.  Accordingly, AOT's principal place of business is not in
the United States, and the Court has subject matter jurisdiction
under § 202.

B.    Petitioners' Amended Motion for Order and Judgment Confirming
      Arbitration Award and Respondents' Motion for Partial Vacatur
      and Modification of Arbitration Award

      1.    Standard of Review

      Section 9 of the Federal Arbitration Act ("FAA") requires this
Court to confirm the Panel's arbitration award unless there is a
basis for vacating the award.  *See* 9 U.S.C. § 9.[12]  Respondents, as
the parties challenging the Award, bear the burden of proving that
vacatur is warranted.  Karaha Bodas Co. v. Perusahaan Pertambangan
Minyak, 364 F.3d 274, 288 (5th Cir. 2004).  Respondents assert that
the Award should be vacated because (1) the Panel exceeded its
authority in interpreting the Agreements, and (2) the Panel was

_____

[12] The U.N. Convention incorporates the FAA to the extent the
FAA is not "in conflict" with the U.N. Convention.  9 U.S.C. § 208.

"guilty of misconduct" because it refused to postpone the arbitration Award to permit more discovery.

    2.   <u>Whether the Panel Exceeded Its Authority</u>

Respondents assert that the Award should be vacated because the Panel "exceeded its powers" by requiring Respondents to close the put rights for PRSI and the Trading Company without requiring Petitioners to deliver their books and records, which Respondents requested.  The Shareholder Agreement and Partnership Agreement provide that if Petitioners validly exercise their put rights, the parties are required to proceed to closing.  At closing, Respondents were required to pay the put prices for the companies, and Petitioners were required to transfer ownership in the companies to Respondents and deliver "documents and assignments as [Respondents] may reasonably request."  Respondents assert that the Award impermissibly "rewrites" the agreement by forcing Respondents to pay the put prices for the companies even if Petitioners fail to deliver documents Respondents reasonably request.

When an arbitration agreement vests an arbitrator with the authority to interpret a contract, his construction must be enforced so long as it is "'rationally inferable from the letter or purpose of the underlying agreement.'"  <u>Glover v. IBP, Inc.</u>, 334 F.3d 471, 474 (5th Cir. 2003) (quoting <u>Executone Info. Sys., Inc. v. Davis</u>, 26 F.3d 1314, 1320 (5th Cir. 1994)).  An award is

rationally inferable from the underlying contract if it "in some logical way, [is] derived from the wording or purpose of the contract." Anderman/Smith Operating Co. v. Tenn. Gas Pipeline Co., 918 F.2d 1215, 1218 (5th Cir. 1990) (internal quotation marks omitted).

The Panel's Award is rationally inferable from the Agreements. The Agreements gave the Panel broad authority to resolve "any dispute arising out of or relating to [these Agreements]." This grant of authority gave the Panel the power to interpret the obligations relating to the put closings. NetKnowledge Techs., L.L.C. v. Rapid Transmit Techs., Civil Action No. 3:02-CV-2406-M, 2007 WL 518548, at *3 (N.D. Tex. Feb. 20, 2007) (concluding that an agreement's broad language, which gave the arbitrator authority to resolve "[a]ny disputes arising under or relating to" the agreement, permitted the arbitrator to interpret the arbitration agreement in such a way as to not give effect to a limitation of liability clause and a merger clause), aff'd, 269 F. App'x 443 (5th Cir. 2008). Here, the Panel explicitly interpreted the provisions requiring Petitioners to deliver "documents and assignments as [Respondents] may reasonably request." Contrary to Respondents' assertion, the Panel did not "rewrite" the Agreements by deleting these provisions. The Panel actually interpreted the Agreements to require Petitioners to turn over documents reasonably requested at the closing on April 27, 2009, as Respondents "simultaneously"

17

fulfilled its payment obligations under the Agreements.[13]  The Panel further stated, however, that the provisions regarding the delivery of documents reasonably requested were not *conditions* that, if unfulfilled, would excuse Respondents from fulfilling their payment obligations or excuse Petitioners from transferring ownership rights in the companies.  The Panel interpreted the provisions regarding the delivery of documents as *covenants* that, if unfulfilled, would have to be resolved by further arbitration.  In sum, because the Panel had express authority to interpret the Agreements, and the Panel's Award was based on a rational interpretation of the terms in those Agreements, the Panel did not exceed its authority.  Kergosien v. Ocean Energy, Inc., 390 F.3d 346, 353 (5th Cir. 2004) ("[S]o far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different than his.").

### 3.    Whether the Panel is Guilty of Misconduct

Respondents assert that the Panel was "guilty of misconduct" because it refused to postpone the arbitration hearing to permit more discovery.  The FAA authorizes vacatur of an award if the arbitrator is "guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, . . . or of any other

---

[13] Award at 59.

misbehavior by which the rights of any party have been prejudiced."
9 U.S.C. § 10(a)(3).  Under this provision the arbitrator "'must
give each of the parties to the dispute an adequate opportunity to
present its evidence and arguments.'"  Forsythe Int'l, S.A. v.
Gibbs Oil Co. of Tex., 915 F.2d 1017, 1023 (5th Cir. 1990) (quoting
Hoteles Condado Beach v. Union De Tronquistas Local 901, 763 F.2d
34, 39 (1st Cir. 1985)).  However, "[a]n arbitrator is not bound to
hear all of the evidence tendered by the parties."  Karaha Bodas,
364 F.3d at 300 (Rosenthal, Dist. J.) (internal quotations
omitted).  The purpose of arbitration is to promote speed and
efficiency:

> [A]rbitrators are not required to sacrifice speed or
> informality in order to permit a party to introduce every
> piece of relevant evidence. . . . Although arbitrators
> may not deny discovery of documents which are central to
> a dispute, they may conduct only such discovery as they
> find necessary and can refuse discovery of evidence of
> uncertain relevance or evidence related to non-merits
> issues.

Roberts v. A.G. Edwards & Sons, Inc., No. B-06-17, 2007 WL 597371,
at *7 (S.D. Tex. Feb. 21, 2007) (citations omitted).  Indeed, the
agreement to arbitrate in this case provided for expedited
arbitration.[14]   Thus, the Panel's refusal to postpone the
arbitration hearing to permit more discovery will warrant vacatur

---

[14] *See* Award at 28-29.

only if "the exclusion of relevant evidence deprive[d] [Respondents] of a fair hearing." Karaha Bodas, 364 F.3d at 301.

Respondents' claims were that Petitioners breached their fiduciary duties to Respondents by (1) profiting from the use of two storage tanks (referred to as the Kinder Morgan tanks) and (2) profiting from trades Petitioners' traders made with the Trading Company.[15]  According to Respondents, they were unable to prove these claims because Petitioners "deliberately withheld" "trading contracts and 'deal sheets', that bore directly on Respondents' claims."[16]  These contracts and deal sheets purportedly would bear upon whether Petitioners earned profits that could have been earned by the Trading Company.

Respondents first objected to the inadequacy of Petitioners' discovery production after finding five email chains that were to or from Petitioners' employees and which allegedly should have been, but were not, produced during discovery.  Although the email chains had nothing to do with Petitioners' alleged breach of fiduciary duties, they prompted Respondents' counsel to question Petitioners' counsel about producing additional documents including trading contracts and deal sheets.  Respondents filed a Motion to Compel three weeks before the hearing,[17] and a week before the

---

[15] Award at 26-28.

[16] Document No. 38 at 19.

[17] Id., ex. A-19.

hearing, Respondents filed a Motion to Continue the hearing for 90 days to allow for additional discovery.[18]  Petitioners objected that Respondents were seeking to delay an unfavorable ruling with a fishing expedition, but nevertheless Petitioners agreed to produce to Respondents the trading contracts and deal sheets Respondents requested.[19]  The Panel thereafter summarily denied Respondents' motions in its Pre-Hearing Order No. 5,[20] and subsequently denied Respondents' motion for reconsideration.[21]

During the eight-day hearing, Respondents questioned witnesses at length about alleged breaches of fiduciary duty, the trading contracts and deal sheets produced in discovery, and "deliberately withheld" contracts and deal sheets.  In their Post-Hearing Opening Brief, Respondents sought to delay the issuance of the Award for additional discovery and "supplemental briefing or further hearings."[22]

The Panel issued its 70-page Award on April 10, 2009, finding that Respondents' claims regarding the Kinder Morgan tanks and the alleged improper trading lacked merit.[23]  The Panel provided a

---

[18] _Id._, ex. A-25.

[19] _See id._, ex. A-21 at 5-6, ex. A-29 at 1-2.

[20] _Id._, ex. A-27.

[21] _Id._, ex. A-30.

[22] _Id._, ex. A-33 at 42.

[23] Award at 26-28.

lengthy analysis rejecting Respondents' request for delay and for additional discovery.  The Panel found that Respondents' contentions that Petitioners abused the discovery processes were "without merit and that further discovery is not warranted."[24]

> The Panel also finds that the discovery authorized here was fully consistent with the scope of discovery authorized by the [Arbitration] Rules . . ., and afforded all parties a reasonable opportunity to prepare their cases for hearing. . . . We further find that [Petitioners] have complied with their discovery obligations and that no further discovery should be ordered.  We also find that the additional discovery sought by [Respondents], if permitted, would unreasonably delay the parties' ability to obtain a Final Award in this arbitration for no persuasive or necessary reason.[25]

Thus, the Panel members, who were in the best position to judge the credibility of the witnesses who testified about the alleged breaches of fiduciary duty and the trading contracts and deal sheets, found that additional contracts and deal sheets would not change their ruling.  *See* <u>Karaha Bodas</u>, 364 F.3d at 302 n.86 (stating that the arbitrators are in the best position to judge the credibility of the witnesses).  In addition, it is uncontroverted that Petitioners *did* produce documents related to specific trades that Respondents identified, and documents regarding the Kinder Morgan tanks that Respondents requested.[26]  Respondents in their

---

[24] <u>Id.</u> at 28.

[25] <u>Id.</u> at 30.

[26] Document No. 38, ex. A-29 at 1-2.

22

briefing to this Court have not acknowledged the fact of Petitioners' supplemental production for Respondents, nor have Respondents specified any inadequacies in that production. Like-wise, Respondents have not identified exactly what additional documents they believe were deliberately withheld, or how the absence of any such additional documents caused Respondents substantial prejudice. *See* Roberts, 2007 WL 597371, at *7 (refusing to vacate an arbitral award for a failure to produce documents after finding "no evidence to show that Movants withheld any documents which were central to the dispute, that the requested documents were relevant to the outcome of the case, or to show that, even if relevant documents existed, the production of the documents would have changed the outcome of the arbitrator's decision, such that the failure to produce those documents resulted in prejudice to Respondent"). After carefully reviewing the evidence submitted by Respondents, including the transcripts of the witnesses questioned about Petitioners' alleged breaches of fiduciary duty, the Court finds that Respondents have not shown that they were denied discovery of documents central to the dispute such as to deny them a fair hearing.

C.   <u>Petitioners' Claim for Attorneys' Fees</u>

Petitioners claim attorneys' fees and expenses incurred during this confirmation proceeding, based upon the Agreements.  Paragraph 10.12 of the Shareholders Agreement provides:

> **<u>Recovery of Litigation Costs</u>**. If *any legal action* is brought by either Shareholder for the enforcement of this Agreement or by reason of an alleged dispute, breach, default or misrepresentation in connection with any of the provisions of this Agreement for damages or any other relief or remedy (declaratory or otherwise), the prevailing party shall be entitled to recover reasonable attorneys' fees and other court and direct costs incurred in connection with such action or proceeding.  This provision shall survive the termination of the Agreement.[27]

The Partnership Agreement contains a nearly identical provision at paragraph 12.13.[28]  Respondents argue that these clauses of the Agreements do not specify "that additional attorney's fees may be awarded by a court during confirmation proceedings."  The attorneys' fees clauses, however, entitle the prevailing party to recover fees and expenses incurred in "*any legal action*" to enforce the Agreement, specifically including "other *court . . . costs* incurred in connection with such action or proceeding."  This legal action for confirmation is precisely for the enforcement of the Agreements as the Final Award of Arbitrators has construed and

---

[27] Shareholders Agreement, Document No. 38, ex. A-2 (emphasis added).

[28] Partnership Agreement, Document No. 38, ex. A-3.

24

applied them, and required the parties to perform them. Petitioners are therefore entitled to recover from Respondents their reasonable attorneys' fees and other court and direct costs incurred in connection with this proceeding. *See* Loeb v. Blue Star Jets, LLC, No. 09-7858, 2009 WL 4906538, at *1, *3 (S.D.N.Y. Dec. 17, 2009) (held, prevailing party in confirmation proceeding entitled to fees for that proceeding in addition to arbitration proceeding fees in the arbitration award, where Agreement provided liability for breach "including attorneys' fees and legal expenses."); Vital Basics, Inc. v. Vertrue Inc., No. 05-65-P-S, 2007 WL 1308806, at *2 (D. Me. May 3, 2007) (same); *see also*, C. Melchers, GmbH & Co. v. Corbin Assocs., LLC, No. 1:05-CV-349, 2006 WL 925056, at *11 (E.D. Tenn. April 7, 2006).

### III.  Order

For the foregoing reasons, it is

ORDERED that Respondents Petrobras America Inc., PAI PRSI Trading General LLC, and PAI PRSI Trading Limited LLC's Motion to Dismiss (Document No. 19), and their Motion for Partial Vacatur and Modification of Arbitration Award (Document No. 38), are both in all things DENIED.  It is further

ORDERED that Petitioners Astra Oil Trading NV, Astra GP, Inc., and Astra Tradeco LP LLC's Amended Motion for Order and Judgment Confirming Arbitration Award (Document No. 53) is GRANTED, and the

25

Final Award of Arbitrators dated April 10, 2009, is in all things CONFIRMED; it is further

ORDERED that Petitioners Astra Oil Trading NV, Astra GP, Inc., and Astra Tradeco LP LLC shall additionally have and recover from Respondents reasonable attorneys' fees and other court and direct costs incurred by them in connection with this confirmation action. Accordingly, within seven (7) days after the entry of this Order, Petitioners shall file their application for attorneys' fees and expenses, accompanied by (1) any fee agreement Petitioners may have with their counsel; (2) counsel's affidavit supported by time records (redacted as appropriate to protect confidential attorney-client communications) upon which Petitioners rely for calculating reasonable attorneys' fees; and (3) a verified itemized list of other court and direct costs incurred by Petitioners in prosecuting this action.  Petitioners shall exclude from their claim fees and expenses incurred by their attorneys that did not contribute toward Petitioners prevailing on the merits, such as Petitioners' futile opposition to filing pleadings and documents under seal.  The parties shall then promptly confer in good faith to reach agreement upon the attorneys' fees and expenses to be awarded.  If agreement is not reached after good faith negotiations, then within ten (10) days after having been served with Petitioners' application, Respondents may file a response together with supporting affidavits, exhibits, and a brief (not to exceed 15 pages in

length), explaining why good faith negotiations did not result in an agreement and stating the amounts of reasonable attorneys' fees and expenses that Respondents believe should be awarded to Petitioners. Thereafter, Petitioners may file a reply (not to exceed 15 pages in length) within seven (7) days after having been served with Respondents' response.

If the parties agree on the amount of attorneys' fees and expenses to be awarded to Petitioners, which they are strongly encouraged to do, they shall forthwith report their agreement in a joint letter to the Court, and the agreement shall be without prejudice to the right of either party to appeal from the Final Judgment.

The Court will enter Final Judgment after determining the amount of attorneys' fees and expenses Petitioners are entitled to recover for this legal action brought to enforce the Agreements by obtaining confirmation of the Final Award of Arbitrators.

The Clerk will enter this Order, providing a correct copy to all counsel of record.

SIGNED in Houston, Texas, on this 10th day of March, 2010.

EWING WERLEIN, JR.
UNITED STATES DISTRICT JUDGE