```
              IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF TEXAS
                       HOUSTON DIVISION


ASTRA OIL TRADING NV,              §
ASTRA GP, INC., and                §
ASTRA TRADECO LP LLC,              §
                                   §
          Plaintiffs,              §
                                   §
v.                                 §       CIVIL ACTION NO. H-09-1274
                                   §
PETROBRAS AMERICA INC.,            §
PAI PRSI TRADING GENERAL LLC,      §
and PAI PRSI TRADING LIMITED       §
LLC,                               §
                                   §
          Defendants.              §
```

                         MEMORANDUM AND ORDER

     Pending are Petitioners Astra Oil Trading NV, Astra GP, Inc., and Astra Tradeco LP LLC's Application for Attorneys' Fees and Costs (Document No. 99) and Respondents Petrobras America Inc., PAI PRSI Trading General LLC, and PAI PRSI Trading Limited LLC's Motion to Reconsider Denial of Rule 12(b)(1) Motion (Document No. 102) and Motion to Reconsider Denial of Motion for Partial Vacatur of Arbitration Award (Document No. 107).  After carefully considering the motions, responses, new evidence, and legal authorities, the Court GRANTS Respondents' Motion to Reconsider Denial of Rule 12(b)(1) Motion, VACATES the Memorandum and Order entered March 10,

2010,[1] and for the reasons that follow GRANTS Respondents' Motion to Dismiss (Document No. 19).

## I. Background

Petitioners Astra Oil Trading NV ("AOT"), Astra GP, Inc. ("Astra GP"), and Astra Tradeco LP LLC ("Astra LP," collectively with AOT and Astra GP, "Petitioners") seek in this action judicial confirmation of an arbitral award rendered in their favor against Respondents Petrobras America, Inc. ("PAI"), PAI PRSI Trading General LLC ("PAI General"), and PAI PRSI Trading Limited LLC ("PAI Limited," collectively with PAI and PAI General, "Respondents"). Petitioners and Respondents were 50% co-owners of a joint venture consisting of two companies. The first company--Pasadena Refining System, Inc. ("PRSI")--owns a refinery in Pasadena, Texas. PRSI was governed by a Shareholders Agreement between AOT and PAI. The second company--PRSI Trading Company LP (the "Trading Company")--is an entity that supplies feedstocks to the refinery. The Trading Company was governed by the Partnership Agreement between Astra GP, Astra LP, PAI General, and PAI Limited.

Soon after executing the Agreements, the parties began having disputes about the strategic vision of the PRSI refinery and the Trading Company. Eventually, Petitioners invoked their rights

---

[1] *See* Document No. 98, Astra Oil Trading NV v. Petrobras Am. Inc., No. H-09-1274, 2010 WL 918438 (S.D. Tex. Mar. 10, 2010).

2

under the Agreements "to put" for sale to Respondents their ownership interests in PRSI and the Trading Company, in exchange for Respondents' payments to Petitioners of sales prices set by pricing formulas.  Respondents refused to recognize Petitioners' attempt to exercise their put rights, and the parties went to arbitration.

On April 10, 2009, the arbitration panel (the "Panel") in a 70-page ruling issued its Final Award of Arbitrators (the "Award").  Petitioners filed this suit to confirm the Award, and Respondents moved to dismiss it for lack of subject matter jurisdiction and, as well, moved to vacate and/or modify the Award.

## II.  Discussion

The U.N. Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958 (the "U.N. Convention"), implemented at 9 U.S.C. §§ 201-08, deems actions involving awards under the U.N. Convention as arising under the laws and treaties of the United States, and vests original jurisdiction in federal district courts to hear such actions. 9 U.S.C. § 203.  The U.N. Convention applies only to arbitral awards that are "not considered as domestic awards in the State where their . . . enforcement is sought," U.N. Convention, art. I(1), 21 U.S.T. 2517, 330 U.N.T.S. 38, that is, the award is not "entirely between U.S. citizens." 9 U.S.C. § 202.  Respondents assert that jurisdiction is lacking

because AOT, a corporation organized under the laws of the Netherlands, has its principal place of business in Huntington Beach, California, where its Chairman and CEO--Mike Winget--resides, offices, and directs and conducts the business of AOT. Petitioners assert that AOT's principal place of business is "in Europe," where AOT's second-tier parent company--Transcor Astra Group--makes significant decisions for the conduct of AOT's business. It is undisputed that all other parties to the arbitral award are United States citizens.

A.   Governing Law

The language Congress used in its 1970 enactment of § 202 to define whether a corporation is a citizen of the United States essentially tracks identical language found in the 1958 re-codification of the diversity of citizenship statute, 28 U.S.C. § 1332(c)(1). Thus, under § 1332(c)(1), a corporation is a citizen of the State of its incorporation and where "it has its principal place of business." Under § 202, a corporation is a citizen of the United States if it was incorporated in the United States or if "it has its principal place of business" in the United States. The Supreme Court recently interpreted the meaning of a corporation's "principal place of business" in a diversity case, and that decision guides the Court in applying § 202's identical language in this case:

4

> We conclude that "principal place of business" is best read as referring to the place where a corporation's officers direct, control, and coordinate the corporation's activities. It is the place that Courts of Appeals have called the corporation's "nerve center." And in practice it should normally be the place where the corporation maintains its headquarters--provided that the headquarters is the actual center of direction, control, and coordination, i.e., the "nerve center," and not simply an office where the corporation holds its board meetings (for example, attended by directors and officers who have traveled there for the occasion).

Hertz Corp. v. Friend, 130 S. Ct. 1181, 1192 (2010). The Court cautioned:

> [I]f the record reveals attempts at manipulation--for example, [if] the alleged "nerve center" is nothing more than a mail drop box, a bare office with a computer, or the location of an annual executive retreat--the courts should instead take as the "nerve center" the place of actual direction, control, and coordination, in the absence of such manipulation.

Id. at 1195. The Court based its holding on two premises. First, the phrase "principal place of business" in the diversity statute-- 28 U.S.C. § 1332(c)(1)--is in the singular and therefore refers to "a single place." Id. at 1193. Second, simple tests streamline cases, reduce the likelihood of gamesmanship, and promote predictability. Id.

Generally, when a subsidiary is incorporated separately from its parent, it is treated as an independent entity for purposes of determining federal court jurisdiction. J.A. Olson Co. v. City of Winona, Miss., 818 F.2d 401, 414 (5th Cir. 1987); *see also* Schwartz

5

v. Elec. Data Sys., Inc., 913 F.2d 279, 283-84 (6th Cir. 1990); Topp v. CompAir Inc., 814 F.2d 830, 837 (1st Cir. 1987).  The cases in which the Fifth Circuit has found that a corporate parent's citizenship controls its subsidiary "have not rejected the 'general rule.'  Rather, in those cases the courts have determined on the basis of particular facts that a subsidiary's principal place of business was the same as that of the corporate parent, Toms v. Country Quality Meats, Inc., 610 F.2d 313 (5th Cir. 1980), or that the subsidiaries were not actually separate corporate entities, Frazier v. Alabama Motor Club, Inc., 349 F.2d 456, 460 (5th Cir. 1965)."  Schwartz, 913 F.2d at 284-85.

B.  Mike Winget's Role as AOT's Chairman and Chief Executive Officer

AOT is a holding company, whose worldwide holdings include companies located in Singapore, Switzerland, the United Kingdom, Canada, and the United States.  AOT was formed under the laws of the Netherlands and, since November 2008, has been wholly owned by a newly formed Swiss corporation, TAGAM, Ltd., which in turn is wholly owned by Transcor Astra Group ("Transcor"), a Belgium corporation.  Transcor has its sole office in Belgium.  Before November 2008, Transcor owned 100% of AOT, and AOT's counsel represents that Transcor formed TAGAM as a subsidiary to hold AOT only for tax purposes.

AOT has no employees. Its formal corporate structure consists of a Board of Directors with four directors, and one officer, namely, its Chief Executive Officer Mike Winget, of Huntington Beach, California. Its directors are: Rolf Mueller of Zug, Switzerland; Ernst Cooiman of Rotterdam, Netherlands; Daniel Burla of Zug, Switzerland; and Winget, who is the Board's Chairman.

Three of AOT's four directors (Mueller, Burla, and Winget) are also directors on the nine-member Board of Directors of AOT's second-tier parent corporation, Transcor. Six of the nine Transcor board members reside in Europe, including Gilles Samyn, who is Chairman of the Board of Transcor and who is also the Chief Executive Officer of Compagnie Nationale á Portefeuille ("CNP"), a Belgian publicly-traded corporation that does no business in the United States, and which indirectly owns 80% of the stock of Transcor. Chairman Gilles Samyn presides over Transcor's formal board meetings, which are held at least twice a year and almost always in Europe.

The central dispute regarding AOT's principal place of business is whether Transcor's board of directors, particularly Gilles Samyn, dominates AOT to such an extent that the Court should find that Transcor operates as AOT's "nerve center" in Europe. The evidence establishes that the Transcor board is responsible for setting the policies for AOT and making major decisions for AOT. The Transcor board ultimately decides whether AOT will buy, sell,

or hold subsidiary companies. In addition, the Transcor board sets the risk policies that must be followed by AOT's subsidiaries. Mike Winget, as AOT's CEO, ultimately answers to Gilles Samyn and the other members of Transcor's board of directors.

The evidence also establishes, however, that Mike Winget has significant independent authority as CEO of AOT to direct, control, and coordinate AOT's activities. Under AOT's umbrella are trading companies and refineries, whose employees perform the day-to-day business of the companies and refineries that AOT owns. Significantly, none of Petitioners has argued or contended that AOT is a mere alter ego of Transcor or that it is not a *bona fide* separate corporate entity that does in fact buy, sell, and own trading companies and refineries on a global scale. Winget describes AOT as follows:

> AOT has under it, in the corporate structure, something on the order of about 40 separate holding companies and operating companies, and each of those have their own finance, accounting, sometimes different corporate officers, different directors. They are the ones that actually carry out the activity of doing those strategies, performing those strategies and objectives, that are set forth by AOT NV. It is--to be more specific, it is not something--I do not myself trade oil, as an example. The other subsidiaries that are under AOT, in Switzerland, as example, those traders, those trade managers, would actually implement those strategies. They would actually perform those activities. I do not.[2]

---

[2] Winget Depo. at 41-42.

Winget further described AOT's role in the Transcor group:

> AOT buys, sells, holds and directs, creates, you know, creates strategies, pass down strategies from the Transcor Astra Group, to the subsidiaries under its-- under its wing. They carry that out. . . . They, meaning the subsidiaries underneath actually carry out the bidding. They conduct the bidding, the business.[3]

The Transcor board sets the overall strategies and makes major decisions for AOT and its subsidiaries, but does not micro-manage all of AOT's affairs.

> Q: Does the AOT board exercise any independent decision making, separate and apart from directions or instructions they might get from a higher authority or owner?
>
> A: You used the word any. It's very--it's very all encompassing. The way it works, as I mentioned, is that Transcor SA largely does the bidding of CNP, if you will, follows what CNP wants, and then it is passed down through AOT, and AOT issues the directives, and then the various subsidiaries and--underneath that, whether operating or holding companies, they do the implementation of that.
>
> Now, if you were to be--to say would AOT or a subsidiary of AOT unilaterally go on out and buy a ship for $50 million, no, that wouldn't happen.
>
> If you are asking me if AOT would ever, you know, in following its directives and policies from Transcor SA, would take some minor, you know, local decision to sign something or--you know, then I suppose it could happen.[4]

---

[3] Id. at 43.

[4] Id. at 197.

Among Winget's responsibilities as AOT's sole officer and CEO are at least three major roles. First, Winget is tasked to negotiate and to execute significant contracts on AOT's behalf when the Transcor board has approved AOT entering into such business arrangements. For instance, during his deposition, Winget specifically discussed that he negotiated and signed the following on behalf of AOT: (1) a 2006 stock purchase agreement through which AOT sold an interest in a company to Petrobras; (2) a draft 2008 purchase and sale agreement though which AOT attempted to sell an interest in a company to Petrobras; and (3) the 2006 Shareholders Agreement governing the management of PRSI.[5] Winget also explores merger and acquisition possibilities with other directors of Transcor and officers of CNP, and Winget has proposed mergers and acquisitions to the Transcor board.[6]

Second, Winget directs and supervises AOT's subsidiary companies. Winget testified:

> My role in the Huntington Beach office is to be the conduit to the will of the Transcor Astra pushed down through AOT directives, so I make sure I monitor what these other subsidiaries do in the group. I do not call the shots, as an example, for day-to-day trading. You'd have to look at our entire structure to get a clear handle of that. Most--the vast majority of the

---

[5] Winget Depo. at 61-62 (2006 SPA), 73-74 (Draft 2008 SPA), 104-105 (2006 Shareholders' Agreement).

[6] Id. at 226-27 (Come by Chance opportunity presented to Transcor board), ex. 34 at 23.

> day-to-day activity in the company is handled directly by people that are not in that office in California.[7]

He further stated:

> I make sure that [AOT's subsidiaries] follow the--that they follow the rules. I do not myself, day-to-day trade or, you know, get involved with their specific activities or say you can do this, you can't do that deal. I don't do that kind of thing, but I see to it that they follow the rules. I monitor what they do.[8]

For instance, Winget attended the board meetings of PRSI--one of the companies that AOT owned jointly with Respondent PAI--as an "observer."[9] Winget also sets the bonuses for various traders who work for AOT's subsidiaries.[10]

Third, Winget contributes to setting the strategy and direction for AOT and its subsidiaries. During the last four years, Winget has taken more of a supervisory role at AOT. The

---

[7] Winget Depo. at 59.

[8] Winget Depo. at 15. Later in his deposition, Winget states:

> I told you this morning earlier that the -- that my job is to be the conduit to take the direction from AOT and to see to it that the various subsidiaries in the AOT system do the implementation.

Id. at 144.

[9] Winget Depo. at 235-37.

[10] Document No. 107, ex. 1 ("All of the traders [of the joint venture] will be paid a bonus by Astra, determined by [Winget] for the performance prior to sell as well as from 9/1 - 12/31.").

11

minutes of the Transcor board meeting on September 20, 2006, report that Gilles Samyn suggested changing Winget's role at AOT:

> [Gilles Samyn] expressed the fact that [AOT] has changed in size and has expanded its activities into managing important assets.  [Gilles Samyn] suggested for Mike [Winget] to focus more on leading the strategic vision and the trading of the company and free some of his time by hiring a senior shadow person that would help Mike in the minutia of managing the financial and day to day activities.  This person should have broad skills and be complementary to Mike.[11]

A year later, at the Transcor board meeting on September 4, 2007, Winget proposed reorganizing the management of AOT's subsidiaries.[12]  According to Winget, AOT's subsidiaries were behaving like "independent silos," and Winget wanted to encourage cooperation among the subsidiary companies.[13]  After discussion with the Transcor board, Winget "created a trade management committee" comprised of the heads from AOT's various trading subsidiaries.[14] Dennis Haller, the senior trader in the Swiss office, was named as head of the committee, and the managers of all other trading subsidiaries report directly to him.[15]  Since this reorganization,

---

[11] Winget Depo., ex. 30 at 000067.

[12] Id., ex. 34 at 000017.

[13] Id. at 221-22.

[14] Id. at 222-23.

[15] Id.

Dennis Haller has been "responsible for the day-to-day trading activity."[16]

Newly disclosed emails provide additional examples of how Winget actively manages AOT and its subsidiaries.[17] In the first email chain, dated December 13 and 14, 2006, several of Petitioners' employees discuss problems with the joint venture, including a potential tax problem. In an email from Kari Burke, a CPA who works for one or more of AOT's subsidiaries, she states that they should wait to get direction from Winget:

> Anyway, the issues are way to [sic] complicated to deal with on e-mail. I think we should wait for Mike to return, regroup and determine a strategy for the future.[18]

The next day, Winget responds to everyone on the email chain:

> Am back now, so lets have that discussion along with setting a strategy re [Petrobras] in terms of the trade versus S+D functions at prsi. We need to go back to

---

[16] Id.

[17] This new evidence was obtained in a pending state court proceeding between the Trading Company and Astra. In that proceeding, Astra was required to provide a privilege log for documents produced, including documents previously provided in the arbitration. The Trading Company challenged 1,310 entries of the privilege log, and a specially appointed discovery master compelled Astra to produce 26 documents, including email chains that appear to have been relevant to the arbitration but were not produced.

[18] Id., ex. 1 (Burke's email sent 12/13/2006 at 11:42 a.m.).

>[Petrobras] with a firm position so we can stop digging our own tax grave.[19]

In the second email chain, from November 2, 2007, employees of Petitioners further discuss the difficulties they are having with Respondents.[20] Significantly, Mike Winget sent a lengthy email of more than 750 words detailing the significant problems with the joint venture and outlining Petitioners' strategies for handling them.[21] The context and substance of these emails evidence that Mike Winget is the recognized corporate leader and central decision-maker, or "nerve center," for AOT itself and for the subsidiaries "under its wing."

Finally, Respondents also proffer portions of Rolf Mueller's deposition, which was taken on March 17, 2010, a week after this Court signed its now vacated Memorandum and Order of March 10. Mueller is the Global CFO for Transcor and its subsidiaries.[22] It is undisputed that AOT's finances are coordinated by Mueller in Switzerland, where he works with auditors and accountants on behalf of AOT. The new evidence establishes, however, that Mueller reports not only to Gilles Samyn but also to *AOT's CEO, Mike Winget*:

---

[19] Id., ex. 1 (Winget's email sent 12/14/2006 at 10:03 a.m.).

[20] Id., ex. 3.

[21] Id., ex. 3 at ASTRA0021583-84.

[22] Document No. 104, ex. A-2 at 156 (Mueller Depo.).

> Q: Who do you report to?
>
> A: I report one side to Mike Winget, CEO; and on the other side to Gilles Samyn at BNP.
>
> Q: So you have a dual reporting function?
>
> A: I have a dual reporting system.
>
> Q: One of those individuals you said is Mr. Winget who is the CEO of [AOT], right?
>
> A: Correct.
>
> Q: The other one you said is to Mr. Samyn, what is his position?
>
> A: He is the Chairman of Transcor Astra Group and he is the Managing Director at CNP.[23]

In sum, Mike Winget, AOT's sole officer, understandably takes directives from AOT's effective owner, Transcor, but as Chief Executive Officer of AOT he holds and exercises all of the authority necessary to direct, control, and coordinate AOT's *own* activities, which he does from Huntington Beach, California.

C.   *Toms v. Country Quality Meats* and the Nerve Center Test

Petitioners rely heavily upon Toms v. Country Quality Meats Inc., 610 F.2d 313 (5th Cir. 1980), for the premise that a subsidiary corporation's "nerve center" may in fact be the place where its parent operates and directs the subsidiary's activities

---

[23] Id., ex. B at 174-75.

and business.  In J.A. Olson Co. v. City of Winona, Miss., the Fifth Circuit summarized its decision in Toms as follows:

> Country Quality, a Delaware corporation qualified to do business in Georgia, was one of sixty similar corporations created and managed by Brueggemeyer & Wolfe (B & W), a Texas corporation. Country Quality, like the other local corporations, was run by B & W, but paid local taxes, had a local bank account, and had its own staff.  B & W, however, exercised almost total control over Country Quality in that it was authorized to discharge employees, it reviewed all sales reports, time cards and payroll sheets and it selected the suppliers from which Country Quality could buy its products.  We also noted that Country Quality was vested with so little managerial authority that its highest-ranking employee "wore an apron," that is, "was primarily engaged in meat cutting activities."  Even though Country Quality had its only contact with the public in Georgia, we looked at the operation as a whole.  The scenario was similar to that of a "far flung" corporation with a concentrated nerve center and diffuse places of activity. Country Quality's operations represented only a single location of the many locations of the corporate activities; the nerve center, however, was in one location. We therefore held that the principal place of business was Texas, the "nerve center" of the operation.

818 F.2d 401, 410-11 (5th Cir. 1987) (internal citations and footnotes omitted).  The Fifth Circuit further explained:

> As demonstrated in Toms, a corporation's nerve center does not have to be located within the corporate shell, but can be found wherever the nerve center exists.  In Toms, the activities and business of Country Quality were operated and directed by a closely affiliated but corporately separate management company.  We therefore consider substance over form in determining the nerve center.

Id. at 412.

16

Toms does not set a rule that every time a parent corporation exerts control over a separately-incorporated subsidiary, the court must look to the most senior decision-maker in the corporate chain to find the nerve center. It is commonplace and expected for wholly owned subsidiaries to fulfill their legitimate corporate responsibilities consistent with the business plan and requirements of their sole owner. Toms, however, is an unusual case where the subsidiary was a "small corporation" that was merely one store among over sixty similar stores in a nationwide meat distribution system. *See* Moll v. Allstate Floridian Ins. Co., No. 3:05CV160, 2005 WL 2007104, at *6 (N.D. Fla. Aug. 16, 2005) (distinguishing Toms because Country Quality Meats, Inc. was a small company while the subsidiary company at issue was not a "small company or a small part of a nationwide business"). All sixty of these small, local subsidiaries were managed by the parent company in Texas. AOT, on the other hand, is not a mere satellite subsidiary of a larger unified business, without substantive executive authority at the subsidiary level. Instead, AOT was formed and/or charged by its owner to act as a holding company, and vested by its owner with authority to own, control, and give oversight to worldwide holdings that include its subsidiary companies in Singapore, Switzerland, the United Kingdom, Canada, and the United States. These subsidiaries are large and diverse: some engage in the business of trading petroleum products, and one subsidiary operates a refinery

17

in the State of Washington.  In 2008, the total sales revenues of the operating companies owned by AOT exceeded $16.7 billion.

Second, the Fifth Circuit "noted that Country Quality was vested with so little managerial authority that its highest-ranking employee 'wore an apron,' that is, 'was primarily engaged in meat cutting activities.'" Olson, 818 F.2d at 411 (describing Toms, 610 F.2d at 315 n.4).  Mike Winget, in contrast, as AOT's Chief Executive Officer, negotiates contracts for AOT in the hundreds of millions of dollars; he explores potential mergers and acquisitions; he "monitors" the employees of AOT's subsidiary companies; he makes or participates in the making of strategic decisions for AOT; and he supervises AOT's finances.  *Cf.* Mercury Fin. Corp. of Ala. v. Aetna Cas. & Sur. Co. of Ill., 900 F. Supp. 390, 395 (M.D. Ala. 1995) (distinguishing Toms because the subsidiary at issue retained control over day-to-day management operations).

D.   AOT's "Nerve Center"

Presumably, Transcor had its own business reasons for maintaining AOT as a separate legal entity (just as it formed TAGAM, Ltd. for tax purposes and made it AOT's first-tier parent) and for naming Mike Winget as AOT's sole officer and CEO. "'[W]here the corporate separation between a parent and subsidiary, though perhaps merely formal, is real and carefully maintained, the

separate place of business of the subsidiary is recognized in determining jurisdiction, even though the parent corporation exerts a high degree of control through ownership or otherwise.'" Topp, 814 F.2d at 837) (quoting Lurie Co. v. Loew's San Francisco Hotel Corp., 315 F. Supp. 405, 410 (N.D. Cal. 1970)). Focusing on AOT, as Hertz requires, leads to the inescapable conclusion that AOT's principal place of business is where its sole officer and CEO--Mike Winget--implements, directs, controls, and coordinates AOT's business activities. While the Transcor board makes major decisions and sets policies for its subsidiary AOT from Europe, the management, direction, control, and implementation of AOT's business activities are effectuated by AOT's Chief Executive Officer, Mike Winget, in Huntington Beach, California. *See* Hertz, 130 S. Ct. at 1192 ("We conclude that "principal place of business" is best read as referring to the place where a corporation's officers direct, control, and coordinate the corporation's activities."). Petitioners, who have the burden to show that jurisdiction exists, have failed to show by a preponderance of the evidence that AOT's principal place of business is not in the United States. Accordingly, because all parties to the arbitral award are United States citizens, this Court does not have jurisdiction under 9 U.S.C. § 202.

III. <u>Order</u>

It is therefore

ORDERED that Respondents Petrobras America Inc., PAI PRSI Trading General LLC, and PAI PRSI Trading Limited LLC's Motion to Dismiss pursuant to Rule 12(b)(1) (Document No. 19) is GRANTED, and this action is hereby DISMISSED for lack of subject matter jurisdiction.  All other pending motions are DENIED as moot.

The Clerk will enter this Order, providing a correct copy to all counsel of record.

SIGNED in Houston, Texas, on this <u>4th</u> day of August, 2010.

*[Signature: Ewing Werlein, Jr.]*

EWING WERLEIN, JR.
UNITED STATES DISTRICT JUDGE